NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0138n.06

No. 18-3504

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | ) ) ) | **FILED** Mar 09, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| OHIO DEPARTMENT OF TRANSPORTATION; OHIO DEPARTMENT OF BUDGET AND MANAGEMENT; COSMOS INDUSTRIAL SERVICES, INC., | ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| Defendants, | ) ) | |
| INTERNAL REVENUE SERVICE, | ) ) | |
| Defendant-Appellant. | ) | |

Before: NORRIS, DAUGHTREY, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Fidelity and Deposit Company of Maryland (Fidelity) and the Internal Revenue Service (IRS) both claim they are entitled to $589,049.49 (the funds) arising from construction contracts between Cosmos Industrial Services, Inc. (Cosmos), and the Ohio Department of Transportation (ODOT). Under the contracts, ODOT owed monthly progress payments to Cosmos for completed work. Fidelity served as a surety for Cosmos's contracts. As surety, Fidelity provided performance and payments bonds for the projects. When Cosmos ran out of money and could no longer meet its obligations—including federal withholding taxes owed to the IRS—it asked Fidelity for financial assistance pursuant to the bonds. Fidelity took over the

operations, providing funds to ensure the projects were completed and to cover liens and other unpaid obligations on behalf of Cosmos.

Fidelity sought to collect the remainder of the progress payments ODOT would have owed Cosmos. But ODOT withheld payment because the IRS had sent levy notices, claiming an entitlement to the remaining progress payments due to Cosmos's unpaid tax obligations. Fidelity filed suit for wrongful levy, arguing that the IRS's tax liens had never attached to Cosmos's rights to future progress payments from ODOT and that Fidelity was entitled to the funds under the doctrine of equitable subrogation. The district court agreed with Fidelity and granted summary judgment in its favor. For the reasons stated, we VACATE the grant of summary judgment in Fidelity's favor and REMAND for further proceedings.

I.

From 2012 to 2015, Cosmos, a contractor, entered into construction contracts with ODOT for various state roadway projects. Seven projects are at issue in this case. All seven projects received federal funds from the Federal Highway Administration (FHA). The contracts required ODOT to make monthly progress payments to Cosmos based on the amount of work completed, after Cosmos submitted applications for payment to ODOT.

Two statutory schemes applied to the contracts: one federal, one state. Pursuant to the Davis-Bacon Act, 40 U.S.C. §§ 3141–48, ODOT was required to withhold funds otherwise payable to Cosmos in the event Cosmos failed to pay certain fringe benefits required by the FHA. The contracts were also subject to Ohio's procedure for mechanic's lien claims, which allows a subcontractor, material supplier, or laborer to procure a lien against a contractor for unpaid services or materials furnished and, in turn, requires ODOT to withhold funds payable to the contractor in an amount sufficient to pay the liens. Ohio Rev. Code §§ 1311.26, 1311.28. For these projects,

Cosmos had to furnish payment and performance bonds.[1] Fidelity provided the payment and performance bonds on behalf of Cosmos for the seven projects.[2]

Cosmos began having cash-flow problems in 2013. As an employer, federal law required Cosmos to withhold Form 941 taxes from employee paychecks and remit those taxes to the IRS. *See* 26 U.S.C. §§ 3102(a), 3402(a); *see also Brewery, Inc. v. United States*, 33 F.3d 589, 591–92 (6th Cir. 1994) (stating that an employer is "required to withhold federal [payroll], Medicare, and income taxes from the salaries of its employees and to pay the withheld amounts to the United States" through a quarterly Form 941 tax return). Cosmos failed to fully pay its Form 941 taxes for 2013, 2014, and a portion of 2015. As a result, the IRS assessed unpaid taxes, associated penalties, and interest for tax year 2013 in April 2014, for tax year 2014 in April 2015, and for the first quarter of tax year 2015 in July 2015. When Cosmos failed to pay, the IRS recorded liens for the tax liabilities on January 6, 2015 (tax year 2013), September 3, 2015 (tax year 2014), and September 30, 2015 (tax year 2015). As of August 2017, the total amounts due (unpaid taxes, penalties, and interest) were $330,803.34 for tax year 2013, $1,246,801.77 for tax year 2014, and $3,434.89 for tax year 2015.

Meanwhile, Cosmos had also failed to pay subcontractors and suppliers, resulting in thirteen mechanic's lien claims filed with ODOT between August 7, 2015 and September 29, 2015. As required by Ohio law, ODOT withheld funds from Cosmos to cover the liens, in the amount,

---

[1] A payment bond is "[a] bond given by a surety to cover any amounts that, because of the general contractor's default, are not paid to a subcontractor or materials supplier." Black's Law Dictionary (10th ed. 2014). A performance bond is "[a] bond given by a surety to ensure the timely performance of the contract." *Id.*

[2] Apparently, Fidelity "issued the bonds based in part upon false and misleading financial information provided to [Fidelity] by Cosmos." As the magistrate judge explained below, "The president of Cosmos testified that she submitted an altered and fictitious financial statement to [Fidelity] for the period ending December 31, 2013 that eliminated any reference to the non-payment of taxes, or the non-payment by Cosmos of certain mandated fringe benefits."

according to the magistrate judge, of $553,590.71. Cosmos had also failed to pay federally mandated fringe benefits; as a result, ODOT withheld funds pursuant to the Davis-Bacon Act, though the amount is in dispute.[3]

On September 2, 2015, Premier Bank, one of Cosmos's creditors, sued Cosmos, seeking to appoint a receiver to take control of the company. The court appointed a receiver, who was to take immediate possession and control of Cosmos's property. Premier obtained a judgment against Cosmos in the amount of almost $2 million. After September 1, 2015, Cosmos provided no more funds to perform the work required by the contracts.

Around September 1, 2015, Cosmos told Fidelity that it could no longer meet its payroll obligations and that it needed assistance from Fidelity under the bonds. Fidelity agreed to help. Fidelity required Cosmos to execute Letters of Direction, which "authorized ODOT to send all funds which were or later became payable under the bonded contracts to [Fidelity]." Cosmos executed the letters on September 8, 2015, and they were sent to ODOT a week later.

Fidelity paid all amounts necessary to release the mechanic's liens. It also provided funds to cure the Davis-Bacon violations, prompting ODOT to release the holds on the funds for those violations. As the IRS acknowledges, however, "it appears that, due to the intervening IRS levies, ODOT did not actually pay those 'released' amounts to [Fidelity]."

The parties disagree on the extent to which Cosmos remained part of the project. The IRS notes that it was not until April 6, 2016, that ODOT declared Cosmos in default and further notes that Fidelity employees admitted that Fidelity did not take over the projects, but rather advanced

---

[3] The magistrate judge explained, "In total, [Fidelity] paid out more than $700,000 in fringe benefits, although the precise amount withheld by ODOT and attributable to past-due claims (as of September 1, 2015), versus ongoing fringe benefits contributions after September 1, 2015, is not clear from the record."

funds to Cosmos for it to finish the projects. Fidelity claims that that the formal declaration of Cosmos's default was irrelevant, as Cosmos, to the extent it remained in existence, could function only with Fidelity's assistance as of September 1, 2015.

On October 26, 2015, the IRS sent ODOT a Notice of Levy, asking it to turn over Cosmos's "property and rights to property . . . that you have or which you are already obligated to pay." The notice sought $294,026.89 for tax year 2013. The IRS sent a similar Notice of Levy to ODOT on December 28, 2015, this time requesting $1,336,105.82 for tax years 2013, 2014, and 2015. Once ODOT received the notices, it stopped making payments under the contracts. ODOT set aside the funds sought by Fidelity for progress payments and for a final invoice, an amount totaling $589,049.49. These are the funds at issue in this case. After ODOT declared Cosmos in default, it formally assigned the two projects left outstanding to Fidelity. It is undisputed that "[n]o portion of the [f]unds relates to work on the two projects completed by [Fidelity] after ODOT declared Cosmos in default on April 4, 2016."[4]

On February 3, 2016, Fidelity filed a complaint against ODOT, the Ohio Department of Budget and Management (ODBM), and the IRS to resolve the dispute over the funds. ODOT and ODBM filed a motion to interplead the funds and to be dismissed as parties. The district court granted the motion and dismissed ODOT and ODBM from the lawsuit. Both remaining parties (Fidelity and the IRS) moved for summary judgment.

Fidelity argued that the IRS was not entitled to the funds because Cosmos had no property interest in the funds and was never entitled to receive the funds. Fidelity said that it, on the other hand, was entitled to the funds based on the doctrine of equitable subrogation and its status as the

---

[4] The magistrate judge said that ODOT declared Cosmos in formal default on April 4, 2016, but Fidelity and the IRS both say that default occurred on April 6, 2016. Whether the default occurred on April 4 or April 6 makes no difference in this case.

performing and completing surety. The IRS, by contrast, argued that when it issued the lien notices, Cosmos had a present property right or interest in future progress payments under the contract; as such, the IRS's liens had attached to the property prior to Fidelity stepping in as surety.

The district court granted summary judgment to Fidelity. The court determined that Cosmos lacked a property interest in any of the funds at issue and that, as surety and under the doctrine of equitable subrogation, Fidelity, and not the IRS, was entitled to the funds. The court "concluded that any right to payment under the ODOT contracts was only a contingent future interest (as opposed to a vested property interest for completed work), [and] that limited interest belonged to [Fidelity] alone, as a performing surety, after September 1, 2015." As to the funds generated before September 1, 2015, and withheld because of the mechanic's liens and Davis-Bacon violations, the court concluded that Fidelity was entitled to the funds due to "its later payment, as surety, of the outstanding liens and fringe benefits claims." Having determined that the IRS had no interest in the funds, the court found it unnecessary to address the secondary issue— whether Fidelity or the IRS held the superior lien interest. The IRS appealed to this court.

## II.

The IRS first challenges the district court's decision as to the funds arising after Fidelity stepped in as surety on September 1, 2015. Pursuant to 26 U.S.C. § 6321, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." *See Drye v. United States*, 528 U.S. 49, 55 (1999) ("[T]o satisfy a tax deficiency, the Government may impose a lien on any 'property' or 'rights to property' belonging to the taxpayer."). After a person refuses to pay a tax, the IRS may "levy upon all property and rights to property . . . belonging to such person or on which there is a lien provided in this chapter

for the payment of such tax."[5]  26 U.S.C. § 6331(a).  "[A]ny person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the [IRS], surrender such property or rights (or discharge such obligation) to the [IRS]."  26 U.S.C. § 6332(a).  But a levy does not give the IRS an automatic right to the property; instead, a levy merely protects the government's interest while any disputes are resolved. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 721 (1985) (stating that the issuance of a levy or compliance therewith "does not determine whether the Government's rights to the seized property are superior to those of other claimants").

Persons claiming an interest in the levied property, like Fidelity here, may file a wrongful levy action.  26 U.S.C. § 7426.  There are several ways in which a levy may be wrongful.  *See* Treas. Reg. § 301.7426-1(b)(iv).  Pertinent here, a levy may be wrongful if it is made "upon property in which the taxpayer had no interest at the time the lien arose or thereafter."  *Id.*  The question, therefore, is whether, at the time of the lien, Cosmos had any property or rights to property to which the IRS's liens could attach.  *See Drye*, 528 U.S. at 55; *see also Aquilino v. United States*, 363 U.S. 509, 512 (1960) ("The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach.").

The district court relied primarily on the doctrine of equitable subrogation to determine that Cosmos had no property or rights to property to which the IRS's liens could attach.  According to the district court, Cosmos had no property in the funds because Fidelity, as performing surety, was entitled to them.

---

[5] In 26 U.S.C. § 6334(a), Congress exempted thirteen types of property from levy.  None of those exemptions applies here.

"Subrogation," generally, is "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary (10th ed. 2014). In Ohio, equitable subrogation "arises by operation of law when one having a liability or right or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid." *Ohio Dep't of Taxation v. Jones*, 399 N.E.2d 1215, 1217 (Ohio 1980) (quoting *Fed. Union Life Ins. Co. v. Deitsch*, 189 N.E. 440, 442–43 (Ohio 1934)). Equitable subrogation provides a performing surety with substantial rights. *See Am. Ins. Co. v. Ohio Bureau of Workers' Comp.*, 577 N.E.2d 756, 759 (Ohio Ct. App. 1991) ("[A] surety may assert the defenses of its principal to the debt held by the obligee" and, "when equitable, a surety is subrogated not only to the rights of the obligee, but also to the rights and remedies of the principal against third parties, where those rights arise from or are closely related to the debt that the surety is called to pay under the suretyship agreement.").

We disagree with the district court that equitable subrogation resolves the tax lien dispute. A lien under § 6321 "arise[s] at the time the assessment is made." 26 U.S.C. § 6322; *see also Nat'l Bank of Commerce*, 472 U.S. at 719. The IRS issued the assessments for all of Cosmos's unpaid taxes *before* Fidelity became performing surety on September 1, 2015. And tax liens stay with the property even if the property passes to another person; that is "the very nature and essence of a lien." *United States v. Bess*, 357 U.S. 51, 57 (1958). So if the tax liens had validly attached to Cosmos's interests in the future progress payments, they remained with the interests when they passed to Fidelity. Whether the liens validly attached depends on whether Cosmos's interests in the future progress payments amounted to property or rights to property under federal law.

Fidelity's status as a performing surety could not alter the status of a preexisting lien. Once Fidelity stepped in as surety, it stood in Cosmos's shoes. *Am. Ins. Co.*, 577 N.E.2d at 759 ("Once the obligation of its principal is completely discharged, [the surety] steps into the shoes of its principal . . . and is entitled to exercise any rights arising from the debt paid."); *see also U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) ("Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party." (quotation marks omitted)). As performing surety, Fidelity could take no greater interest than Cosmos held. *See Md. Cas. Co. v. Citizens Nat'l Bank of Caldwell*, 18 Ohio App. 193, 199 (1923) ("A surety paying the debt of his principal can acquire no greater rights than the creditor had at the time of payment; can acquire no priority of lien which the creditor did not have."); *see also W. Cas. & Sur. Co. v. Brooks*, 362 F.2d 486, 491 (4th Cir. 1966) (applying Ohio law and recognizing that "[i]t is clear . . . that the surety cannot, by way of subrogation, assert any greater rights than the creditor in whose shoes it is substituted"). If the liens had attached to Cosmos's interests in the progress payments, Fidelity took subject to those liens when it acquired Cosmos's interests.[6] Equitable subrogation, therefore, did not alter or extinguish any rights Cosmos had in the future progress payments.

---

[6] *Wayne County Board of County Commissioners v. Mendel, Inc.*, 22 F. App'x 488 (6th Cir. 2001), is instructive. There, a panel of this court considered the effect of an IRS tax lien that had attached prior to a surety's interest. *Id.* at 490. The surety and the IRS disputed who would receive undisbursed funds from a completed construction project. *Id.* The surety had paid two subcontractors on behalf of the contractor. *Id.* The government assessed a tax liability on the contractor. *Id.* When the construction work was finished, Wayne County, the contractee, kept undistributed contract funds pursuant to a provision of the contract that allowed it to withhold some funds until completion. *Id.* The IRS tried to levy on the withheld funds, but the surety claimed entitlement to them. *Id.* The panel first determined that the contractor had a property right in the funds to which the tax liens could attach—the undistributed funds that it had earned by completing the project. *Id.* at 491. Because the IRS's tax liens had attached to the property before the surety acquired an interest in the funds, "the district court was correct in finding that the government's lien took priority." *Id.* at 492. The panel noted the ways in which the surety could

The determinative question, then, is whether the interests Cosmos held in the future progress payments from ODOT, at the time the IRS liens attached, constituted property or rights to property under the federal tax lien statute, 26 U.S.C. § 6321. That "is ultimately a question of federal law." *United States v. Craft*, 535 U.S. 274, 278 (2002). State law, nonetheless, plays a role because "[t]he federal tax lien statute itself 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" *Id.* (quoting *Bess*, 357 U.S. at 55). Therefore, "[w]e look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation." *Id.* (alteration in original) (quoting *Drye*, 528 U.S. at 58).

So how do we determine what state law rights a taxpayer has in property? The Supreme Court has explained, "A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." *Id.* "State law determines only which sticks are in a person's bundle. Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." *Id.* at 278–79. The Court has cautioned, "In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them. Such state law labels are irrelevant to the federal question of which bundles of rights constitute property that may be attached by a federal tax lien." *Id.* at 279; *see also id.* at 282 (looking past the label "tenancy by the entirety" to determine the taxpayer's individual rights created by state-

---

have obtained "super priority" for its interests in the property under Ohio law, but determined that the surety had not taken the necessary steps. *Id.* Therefore, the fact that the surety had become equitably subrogated to the rights of the contractor did not defeat the IRS's claim to the funds. Instead, in the face of a validly attached tax lien antedating the surety's equitable interest, the surety was left to argue that its interests had priority for other reasons.

law rules, which included, among others, "the right to use the property, the right to exclude third parties from it, [and] the right to a share of income produced from it").

Once it is determined which "sticks" Cosmos has in its bundle under state law, federal law controls the question of whether those sticks qualify as property or rights to property under the federal tax lien statute. *Id.* at 289. By using the broad language of "property" or "rights to property" in §§ 6321 and 6331(a), "Congress meant to reach every interest in property that a taxpayer might have." *Nat'l Bank of Commerce*, 472 U.S. at 720. According to the Supreme Court, "[w]hen Congress so broadly uses the term 'property,' we recognize . . . that the Legislature aims to reach every species of right or interest protected by law and having an exchangeable value." *Drye*, 528 U.S. at 56 (citation and internal quotation marks omitted); *see also Glass City Bank v. United States*, 326 U.S. 265, 267 (1945) ("Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes."). "[I]n determining whether a federal taxpayer's state-law rights constitute 'property' or 'rights to property,' '[t]he important consideration is the breadth of the control the [taxpayer] could exercise over the property." *Drye*, 528 U.S. at 61 (second and third alterations in original) (quoting *Morgan v. Comm'r*, 309 U.S. 78, 83 (1940)).

Not all interests, however, are property or rights to property under federal law. For example, in *Drye*, the Court concluded that Drye's interest as heir to his mother's estate constituted property or rights to property under § 6321 because "Drye had, at his mother's death, a valuable, transferable, legally protected right to the property at issue" and he "exercise[d] dominion over the property." *Id.* at 60–61. But the Court cautioned that it did not "mean to suggest that an expectancy that has pecuniary value and is transferable under state law would fall within § 6321 prior to the time it ripens into a present estate." *Id.* at 60 n.7. And in *Bess*, the Court concluded

that the taxpayer's proceeds from his own life insurance policy (payable on his death) were not property or rights to property because he had "no right to receive the proceeds while he live[d]" and thus the proceeds were "never within the insured's reach to enjoy." 356 U.S. at 55–56.

Because of its focus on equitable subrogation, the district court did not undertake the analysis required by *Drye* and *Craft*. It did not address which, if any, sticks Cosmos had in its bundle under state law and whether those sticks would qualify as property or rights to property under federal law. Having clarified the role of equitable subrogation and the proper analytical framework, we vacate the district court's order granting summary judgment in Fidelity's favor and remand for it to address these issues in the first instance.

If the liens did attach to Cosmos's interests in the future progress payments, then the funds at issue in this case were encumbered by the IRS's tax liens. As stated previously, the liens stayed with the property even when Cosmos assigned its rights to receive payment to Fidelity. *See Bess*, 357 U.S. at 57. And from September 1, 2015 until April 6, 2016 (the date on which Fidelity officially defaulted Cosmos), Fidelity's right to receive payment was derived from the contracts between Cosmos and ODOT. This is expressly acknowledged in the Letters of Direction. *See, e.g.*, R. 12-1, PageID 150 ("We hereby irrevocably request that all payments due or to become due on account of the contract dated May 5, 2015 between [ODOT] and [Cosmos] be forwarded to [Fidelity], which company is surety on the bond given in connection with the aforesaid contract."). Even as surety, Fidelity merely stood in Cosmos's shoes, meaning that its right to receive payment was no greater than Cosmos's—based on the contracts between Cosmos and ODOT and encumbered by the liens. *Am. Ins. Co.*, 577 N.E.2d at 759. Until Fidelity officially defaulted Cosmos on April 6, 2016, Fidelity had no rights of its own. So, if the liens had attached to Cosmos's interests in the future progress payments, Fidelity's right to receive payments was also

encumbered by those liens; when Fidelity performed on the contract on Cosmos's behalf, those encumbered rights to future payments ripened into encumbered receivables.[7]   In the event the district court determines that the liens had attached to Cosmos's interest in the future progress payments, we leave it to the district court to address any remaining arguments the parties may have in regard to the funds earned after September 1, 2015.

### III.

We turn now to the second subset of funds—those related to the mechanic's liens and the Davis-Bacon violations.  We conclude that the district court erred when it held that Fidelity was entitled to the funds related to the mechanic's liens.  In concluding that Fidelity was entitled to these funds, the district court relied on *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962).  In *Pearlman*, the construction contract with the government contained a provision allowing the

---

[7] *Aetna Casualty and Surety Co. v. United States*, 845 F.2d 971 (Fed. Cir. 1988), which the district court relied on to conclude that Fidelity had a right to the funds even though it had not officially defaulted Cosmos, does not change this result.  There, the surety (Aetna) sought retained funds on three construction projects for which it had issued performance bonds.  *Id.* at 972.  The United States Navy awarded Mansfield Contracting Company three construction contracts, and Aetna issued the payment and performance bonds for the project.  *Id.* at 973.  When Mansfield informed Aetna that it could not meet its obligations, Aetna funded Mansfield's operations, until Mansfield was able to begin operating again; once Mansfield resumed operations, Aetna continued to fund payments to subcontractors and suppliers.  *Id.*  When Mansfield collapsed, Aetna sought the funds for the work already completed.  *Id.*  Instead, the Navy sent the funds to the IRS for taxes owed by Mansfield.  *Id.*  The Federal Circuit concluded that no formal takeover of the project was necessary for the surety to qualify as a performing surety.  *Id.* at 975.  The court recognized that a surety "may satisfy its obligations in various ways."  *Id.*  "For example," the court continued, "the surety may formally take over the project and contract for its completion, or it may allow the project to be defaulted and let the government complete or contract for the completion of the project, in which case the surety is responsible for costs in excess of the contract price."  *Id.*  Or, "[a] performing surety may also satisfy its obligation by providing funds to an insolvent contractor to complete performance."  *Id.*

*Aetna* does nothing more than explain how a party satisfies its duties as surety.  Here, there is no doubt that Fidelity became surety on September 1, 2015, when Cosmos sought financial assistance and Fidelity made payments and performed under the contracts, whether Cosmos had officially defaulted or not.  That point is clear.  *Aetna*, however, does not say that the surety's involvement extinguishes any previously attached lien.

government to "retain and hold a percentage of estimated amounts due monthly until final completion and acceptance of all work covered by the contract." *Id.* at 134. The reserved fund was "retainage" or a "retained fund," which Black's Law Dictionary defines as "[a] percentage of what a landowner pays a contractor, withheld until the construction has been satisfactorily completed and all mechanic's liens are released or have expired." Black's Law Dictionary (10th ed. 2014). Because those funds had been specifically set aside for the purpose of paying lien claimants, "the surety, having paid the laborers and materialmen, [was] entitled to" receive the funds. *Pearlman*, 371 U.S. at 141.

The contracts here do not contain a retainage provision. No portion of the contract funds in this case was, therefore, specifically earmarked to pay lien claimants until after the IRS's tax liens had attached to Cosmos's interests. In a published opinion, our court distinguished *Pearlman* on these very lines. *See In re Constr. Alts., Inc.*, 2 F.3d 670, 675 (6th Cir. 1993). The district court was wrong to rely on *Pearlman*.

The entitlement to the funds related to the mechanic's liens claims hinges on whether the IRS's tax liens attached to Cosmos's interests in the future progress payments. The IRS assessed unpaid taxes, associated penalties, and interest for tax year 2013 in April 2014, for tax year 2014 in April 2015, and for the first quarter of tax year 2015 in July 2015. The mechanic's lien claims, thirteen in total, were filed beginning in August 2015, after the IRS's assessments. The claims of subcontractors or materialmen who file mechanic's liens "are limited to, and rise no higher than, those of the principal contractor." *State ex rel. Gen. Elec. Supply Co. v. Jordano Elec. Co.*, 558 N.E.2d 1173, 1178 (Ohio 1990). Therefore, if the liens had attached to Cosmos's interests in the future progress payments, the mechanic's lien claimants were subject to the limitations on Cosmos's interests—i.e., the IRS's tax liens; Fidelity was subrogated to the rights of the lien

claimants once it paid their claims. *See Constr. Alts.*, 2 F.3d at 675 ("Under Ohio law, a surety that pays amounts owed to a subcontractor, laborer, or supplier is subrogated to the rights of those it has paid and to the rights of those persons whose obligations the surety has discharged—i.e., the owner and the contractor."). We leave it to the district court on remand to resolve the mechanic's lien dispute once it determines whether the tax liens had attached to Cosmos's interests and to address any additional arguments related to the mechanic's lien claims such as Fidelity's argument that its interests take priority over the IRS's interests, no matter when the IRS's liens attached. *See id.* at 676–77.

We also remand for further consideration of the funds related to the Davis-Bacon violations. Unlike the mechanic's liens, the record does not say when ODOT placed the holds on Cosmos's funds in response to the Davis-Bacon violations. Even if we had decided today that the IRS's tax liens had attached to Cosmos's interests in the future progress payments, we would not speculate as to the legal effect of the holds on the funds for the Davis-Bacon violations without knowing whether the funds were encumbered by the IRS's tax liens. Given the dearth of information, we leave it to the district court on remand to once again address the Davis-Bacon violations funds once it has resolved the tax liens issue.

\* \* \*

We VACATE the grant of summary judgment in Fidelity's favor and REMAND for further proceedings.